Filed 3/20/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PAUL B. HERRIOTT, | B287997 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BD415787) |
| v. | |
| ALICJA Z. HERRIOTT, | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Mark A. Juhas, Judge. Affirmed.

Paul B. Herriott, in pro. per., for Plaintiff and Appellant.

Alicja Herriott, in pro. per., for Defendant and Respondent.

———————————

**INTRODUCTION**

A divorced, elderly couple—Paul and Alicja—continued to reside in the same building after dissolving their marriage.[1] Since then, the former spouses have a documented history of legal actions, complaints, and issues against one another. Each requested a restraining order against the other in connection with overlapping events and/or incidents. After concluding trial on both parties' requests for restraining orders, the trial court granted both, with certain modifications.

Paul, in propria persona, appeals from the restraining order issued against him, and argues the trial court erred in granting same. He also appeals from the restraining order issued against Alicja arguing the trial court incorrectly interpreted the relevant statute[2] in rendering its decision. And finally, Paul argues the court failed to make the required detailed finding of fact as to who—Paul or Alicja—was the "primary aggressor" in the dispute after issuing what Paul argues were mutual restraining orders. We disagree with all three of Paul's positions.

---

[1]  Because the parties share the same last name, we will refer to them by their first names to avoid confusion; we intend no disrespect.

[2]  Welfare and Institutions Code, section 15657.03, subdivision (b)(4)(B).

2

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Relevant Background Information*

We rely on the record provided to piece together and summarize the factual and procedural history of this dispute.[3]

Paul and Alicja dissolved their marriage effective November 28, 2007.[4] Since then, Alicja has been "living rent-free" in the building located at 123 24th Street in Hermosa Beach; said building is owned by Paul. She lived on the 2nd floor of this building, while Paul lived on the 3rd floor.

According to Paul, Alicja "continue[d] to harass [him] with outrageously excessive litigation,"[5] and was declared a "vexatious

---

[3] Based on a review of the record, many documents were not provided by Paul by way of the clerk's transcript, including but not limited to: a) the November 16, 2017 temporary restraining order; b) exhibits 1 through 11 and A, all admitted during trial and relied on by the court in making its orders; c) the declarations submitted by two of the parties' children on behalf of Alicja's request for domestic violence restraining order; and d) the parties' November 28, 2007 judgment of dissolution, which both parties and the court made multiple references to and relied on during trial on December 11 and 12, 2017.

[4] Paul and Alicja's stipulated judgment of dissolution was entered on November 28, 2007.

[5] Paul testified during trial in this matter, that Alicja had previously told him, "I'm going to sue you till your last breath, till you take your last breath."

litigant."[6] There have been many instances since their divorce where Paul was "ambushed" or "blocked" by Alicja on the 2nd floor when going to and from his place of residence on the 3rd floor. Paul described being "slammed [with] an iron door" by Alicja while he was walking up the stairs to his apartment unit. Living in such close proximity to Alicja has filled Paul's life with "abuse, stress and anxiety of on-going harassment."

There have also been issues between Alicja and Paul's brother Parker, who lives less than a block away from them. Parker serves as trustee of Paul's trust, and is also one of Paul's caregivers. According to Paul, Alicja repeatedly blocks Parker from going up the stairs to Paul's apartment.

According to Alicja, however, she hardly ever spoke with Paul or Parker, let alone physically and/or verbally abused them, and that her only interactions with Paul were to help him in emergency situations. She described one such instance where she had no choice but "to turn off the water for [the] whole building" because she realized Paul left his home having forgotten to turn off the "water running in [his] shower." She also

---

[6] Paul stated in his brief that Alicja—the vexatious litigant— has recently initiated many legal actions without obtaining the requisite prefiling order, causing unnecessary litigation that was ultimately dismissed. A great number of Alicja's cases have been dismissed for failure to first obtain a prefiling order, including a California Supreme Court case dismissed in June 2015 and a tort (slip and fall) case dismissed in April 2018. Paul represented that there have been "about nine appeals," "they've gone to the Second District," "they've gone to the California Supreme Court," and that "there's been two at the United States Supreme Court." Paul's counsel told the court he "suspect[s] that that's one of the reasons why she's on the list of vexatious litigants."

4

stated that she has never gone to Paul's apartment, and only went once or twice to help Paul when she heard a "noise of [a] big object falling to the floor" from his apartment above her floor, and would find him "laying on the bad [*sic*] in the big paddle [*sic*] of blood."

It appears there has been a repeated pattern of "he said, she said" scenarios between the parties, resulting in the police being called many times, protracted litigation, and Alicja being declared a "vexatious litigant."[7]

B.    *Requests for Restraining Orders*

On November 16, 2017, Paul filed his request for an elder abuse restraining order (hereinafter EARO) against Alicja, and listed both himself and Parker as persons to be protected. Paul alleged Alicja "regularly screams, yells, calls names, threatens, prevents his movement, attacks him physically, wrongfully enters his home and takes his property." Paul described multiple instances of physical and emotional abuse that he suffered from Alicja; she "has previously attacked [him] with scissors," "punched him," and "slammed a heavy wrought-iron door into him," which "almost knocked [him] down . . . [and] caus[ed] injury to his face, mouth, ribs, leg and foot." He "has been taken to the hospital multiple times due to high blood pressure from the stress and mental abuse by Alicja and for physical injuries inflicted," "required medical treatment for injury to his foot from [being slammed with] the iron gate" and was "diagnosed [with] broken ribs."

---

7    See footnote 4, *ante*.

5

In his request for an EARO, Paul explained how Alicja previously had financially abused him when she "intentionally intercepted a rent check made payable to [him] for the operation of his property," "deposited said rent check . . . and kept the funds." Additionally, Paul described an instance where the paramedics were called for him because of a medical emergency, and Alicja told the police not to allow Parker to come through to see Paul, because "she owns [the] building." Paul also described another instance, in "Spring 2016," where Alicja "harass[ed] [Paul's tenants], called the police, falsely claimed that [the tenants] were wrongfully occupying the apartment unit, and ultimately drove them out of the unit, all while [Paul] was away from [his] property having medical treatment for the injuries she caused [him]."

In his EARO request, Paul asked the court to make the following orders:

1) That Alicja cannot "[p]hysically abuse, financially abuse, intimidate, . . . attack, strike, stalk, threaten, assault . . . , hit, harass, destroy the personal property of, or disturb the peace of [Paul]";

2) That Alicja cannot "[c]ontact [Paul], either directly or indirectly, in any way";

3) That Alicja cannot "interfere with Paul's real or personal property" and cannot "interfere with [Parker's] access to [Paul]"; and

4) That Alicja "[v]acate the property [located at] 123 24th Street."

The court issued a temporary restraining order that same day, on November 16, 2017, requiring Alicja to move out of the

123 24th Street building until December 11, 2017—the date of the hearing on Paul's EARO request.[8]

On December 5, 2017, Alicja filed her request for domestic violence restraining order (hereinafter DVRO) against Paul. She described the "most recent abuse" as having occurred on November 3, 2017, where Paul came to her apartment to "salve [*sic*] [a] dispute between" their son, Adam, and daughter, Paula. Paul "didn't help the situation but he yelled at [their] daughter [Paula] with derogatory language" including "hooker, druggie[,] and telling her to take drugs and go to Hollywood Blvd to sale [*sic*] herself." As a result, Alicja asked Paul to leave, but he refused and instead "demanded [Alicja] leave and [said] he is going to take [Alicja] to . . . court."

Alicja also described another instance of "abuse" that took place on October 16 and 17, 2017, where Paul "walk[ed] by [Alicja's] back door [and] slam[med] the iron gate at [Alicja's] door." Paul "yell[ed] at [Alicja] outside the door and br[ought] up personal issues of the divorce for the public to hear." Alicja recalled an instance where Paul and/or one of his employees opened the electric fuse box for her unit and turned the electricity on "for [the] area outside [Alicja's] responsibility," which caused an "increase[e] [in her] monthly electrical bills up to 80%, and annoy[ed] [her] without legitimate purpose but harassment." Alicja described another instance of abuse that took place on October 23, 2015, where Paul's employee, Ruben, painted the steps outside of her apartment and left them "unmarked,"

---

[8]    As we were not provided with a copy of the temporary restraining order issued November 16, 2017, our summarization of the issued orders is based upon the information provided in both parties' briefs and the record.

7

causing Alicja to slip and fall and "permanently injure[] [her] lower back and the neck spinal [*sic*]."

A temporary DVRO was granted against Paul, ordering him to stay "at least 20 yards away" from Alicja.

On December 8, 2017, Alicja filed her response to Paul's request for EARO. She denied having caused any "physical, verbal[], [or] financial abuse" toward Paul, and stated that "[a]ll the accusation[s] are false and malicious with intend [*sic*] to harm and prosecute" her. Alicja also responded to Paul's accusation that she intercepted a rent check for $1200, stating that she "has no key to his mailbox" and that the rent check was made only to the name "Herriott," and did not specify which Herriott, implying that her depositing the rent check was an innocent mistake. She explained that the bank rectified the mistake since then and refunded the funds.

C. *Relevant Trial Court Proceedings and Rulings*

During the hearing on Paul's EARO request on December 11, 2017, the parties stipulated the court could advance the hearing[9] on Alicja's request for DVRO so both requests could be heard concurrently. Thus, trial was held on December 11 and 12, 2017. During trial, both parties testified, as well as the parties' daughter Paula, Parker, and Paul's employees Ruben and Jinnifer. We summarize their testimony, in relevant part, as follows.

The court asked Paul when the incident with Alicja chasing him with scissors, described in his EARO request, took place; Paul admitted that the attack took place a long time ago, when

---

[9] The hearing on Alicja's request for DVRO was originally set for December 26, 2017.

8

his "daughter . . . was still a teenager." The court then asked Paul when the other incident described in his EARO request—where Alicja had punched Paul in the face—took place; Paul again admitted that it took place a long time ago "[w]hen [they] were married" and "when the children were very young."

The court asked Alicja when was the last time that Paul "kick[ed] and slammed the iron gate at [her] door?" Alicja replied that Paul did this "[m]aybe a couple months ago when he walked by" and that "[h]is brother does it too." Alicja testified that contrary to Paul's allegations, she has never intentionally swung open the gate outside her apartment door into Paul while he was walking up the stairs. She said there was one time where Paul "was loosing [*sic*] blood pressure" and "was fading outside [Alicja's] gate," at which point she grabbed him by his arms and called 911.

Paul argued that Alicja has been "interfering with [his] management of his real estate, [and that] it becomes an issue when there's interception of rent checks, when there's interfering with the cable man." Alicja admitted that she has turned the electricity off in the 123 24th Street building "[m]aybe once." Alicja also admitted that she has turned the water off in the building "[a]t least twice" within the last six months, but only "to prevent flooding" when Paul had left the shower water on.

Paul sought to have Alicja excluded from the entire building located at 123 24th Street, stating that "[s]he has a very short fuse" and is "concerned that with such a short fuse[,] that [he] could be the object of her anger." Paul stated Alicja has no ownership interest or leasehold interest in her current place of residence in Paul's building. Alicja, however, testified that the divorce decree provided her with the right to stay at the 123 24th

9

Street building until Paul remodeled the Silver Strand building,[10] where Alicja could thereafter move, since she was awarded some ownership interest of the Silver Strand building by way of the parties' November 28, 2007 judgment of dissolution. Alicja testified that she has "a right to . . . privacy and safety" and that "[n]o one should come into [her] place with [her] children, [her] belongings until the issues are addressed in the court and [she] can move into Silver Strand, finally." She referred to a court order[11] that stated Alicja "shall reside at that residence until the property on Silver Strand is structurally modified, at which time [Paul] shall resume exclusive use of both properties." Because Paul "doesn't comply with" these orders, Alicja had no choice but to "file[] [a] motion for Order to Show Couse [*sic*] re: Contempt of Court Order, Judgment filed on November 28, 2017." Paul, however, argued that Alicja is referring to a pendente lite court order issued prior to the parties' judgment of dissolution, and that the latter now controls.[12]

Parker testified that when Paul was having a medical emergency and "was laying on the floor," he was not allowed to see Paul because Alicja told the police officers that she "do[es]n't want [Parker] upstairs" and "do[es]n't want him in the building" because she "own[s] this property." Parker also testified that he

---

[10]    The Silver Strand building is another building owned by Paul.

[11]    The court order was dated April 24, 2005.

[12]    We render no opinion as to this issue and/or question of fact, as the parties failed to include a copy of their November 28, 2007 judgment of dissolution as part of the record, disabling us from addressing this particular issue.

10

has observed physical manifestations of stress on his brother, as well as insomnia and high blood pressure, because of "the fear of not knowing what's going to happen to him next with his ex-wife." He stated that Paul "had to put chains on his door to keep [Alicja] out, because she would come in without permission."

Paul's bookkeeper, Jinnifer,[13] testified that she caught the parties' daughter Juliana "stealing money from Paul's account," and that Juliana admitted that "her mom is behind all this."

Paul's worker, Ruben,[14] testified that the incident where Alicja allegedly fell from his having painted the steps outside her apartment unit took place "two years ago", in "[a]pproximately, 2015." He said he was "just working there," that he "work[s] there all the time," and that "they always see [him] . . . working there," as if to imply that he was not doing anything out of the ordinary.

The parties' daughter, Paula, testified to more recent events—specifically, the November 4, 2017 incident where she and her brother got into an argument that caused Paul and Alicja to get into an argument. She stated her parents have an extremely "volatile" relationship, and that "[i]t's been hell being a child for them." She also stated that Paul "doesn't talk about [Alicja] so kindly" and yells things to Alicja such as, "Why don't you move out? Go back to Poland." Paula informed the court that the most recent instance where her father has "hat[ed] on mom" was "a few days ago."

At the conclusion of the hearing, the trial court stated: "This sounds like this is really a horrible set of circumstance[s]

---

[13]     Jinnifer has been Paul's bookkeeper since 2011.

[14]     Ruben has been employed by Paul since 1988.

11

for everybody.  I don't believe that I can . . . kick out – I don't believe that I can remove [Alicja].  I think that's an unlawful detainer."  The court further stated:  "I don't think I can make the finding, but I think it's pretty clear that she has no ownership interest or right, title, or interest to either apartment.  I don't think I have jurisdiction to remove her from anything.  I think I have jurisdiction to do some other things, but I don't think I can remove her."

The court looked up the definition of "dwelling" on Dictionary.com, and read its definition as "a building or place of shelter to live in, place of residence, abode, home."  The court explained:  "I'm going to interpret that as not -- that I can't remove her from . . . an entire apartment building.  I can remove her from a house, because that's one unit, one thing, a single family residence.  I think I can remove her from an apartment, if they were living together.  I think I could do that.  I don't think I can say that I'm going to remove her from the entire apartment building."  The court said it "can keep them apart as best [it] can, but . . . do[es]n't think [it] can kick [Alicja] out of the apartment building."  The court then opined that "[t]his may, actually, be a very good appellate question."

The trial court issued an EARO against Alicja on December 12, 2017, ordering her to stay at least 100 yards away from Paul and Parker in general, and to stay at least 10 yards away from them in the apartment building's public spaces. The EARO also prohibited Alicja from:  (1) physically abusing, financially abusing, attacking, striking, stalking, threatening, assaulting, hitting, or harassing Paul or Parker; (2) contacting Paul or Parker; (3) turning off any utilities in the 123 24th Street building and any other buildings owned by Paul; (4) entering

Paul's apartment; (5) taking any mail meant for Paul; and (6) interfering with Paul's management and maintenance of the 123 24th Street building. The court granted the EARO for a period of five years; it is set to expire on December 12, 2022.

While issuing the EARO, the court made the following findings. "[T]here is a long pattern of abuse and actions from [Alicja] towards [Paul] that arise to the level of awarding an [EARO]. It is more than financial abuse. I think that the evidence is clear that she's been in his apartment inappropriately, that she has no right, title, or interest to the property but has done things like turn off the water, turn off the electricity, gotten into his mailbox, inappropriately deposited a check. [¶] I don't find [Alicja] credible that she didn't know what she was doing and all of that. I think that these people have spent a very, very long time messing with each other. It sounds to me . . . like what finally precipitated it was this November 2nd, 3rd, 4th incident between the two kids where it really got ugly. And so I think that maybe has gotten it to the head."

The court also issued a DVRO against Paul on December 12, 2017, similarly ordering him to stay at least 100 yards away from Alicja in general, and to stay at least 10 yards away from her in the apartment building's public spaces. The DVRO was granted for a period of five years; it is set to expire the same date as the EARO—on December 12, 2022. While issuing the DVRO, the court stated, "Based on what [Alicja] [and] what Paula . . . said, I think it's apparent that there is sufficient abuse, harassment, and intentional disturbing the peace here to grant a [DVRO] against [Paul]. I am not granting a mutual restraining order arising out of the same set of circumstances. I am not

13

designating a primary aggressor.  [¶]  So, as a result, this isn't a mutual restraining order . . . as required under the statute."

This appeal followed.

## DISCUSSION[15]

A.    *The Trial Court Did Not Abuse its Discretion in Issuing the DVRO Against Paul.*

The Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.) (hereinafter DVPA) exists "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period

---

[15]    As an initial matter, we note that the appellate briefs filed by both parties were deficient and failed to reasonably assist this court in our understanding of the facts or analysis of the legal issues in this case.  Alicja's brief makes repeated references to evidence without any citation to the record as required by California Rules of Court, rule 8.204(a)(1).  Indeed, in many instances, our review of the record confirms no evidence supporting these statements.  It is not this court's task to search the record for evidence that supports a party's factual statements, and we may disregard statements not supported by proper citation.  (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1310, fn. 3; *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826, fn. 1.)  Both parties also misrepresent the record in several places.

Further, we observe that Respondent has attached documents to her brief that are not included in the record.  We disregard these references.  (Cal. Rules of Court, rule 8.204(a)(2)(C).)  However, as one of the documents Respondent attached to her brief is a confidential child custody evaluation report, we have considered sanctioning Respondent.  (See subsection D of Discussion herein, *post*.)

14

sufficient to enable these persons to seek a resolution of the causes of the violence." (Fam. Code, § 6220.) Under the DVPA, a court is authorized to issue a protective order enjoining a party from engaging in specific acts of harassment or abuse against a cohabitant or former cohabitant. (Fam. Code, §§ 6211, subd. (b), 6218, 6322, 6340, subd. (a)(1).) The court's issuance of a protective order under the DVPA is a discretionary matter. (Fam. Code, § 6300.) " 'A trial court's exercise of discretion will not be disturbed on appeal unless, *as a matter of law,* an abuse of discretion is shown—i.e.,—where, considering all the relevant circumstances, the court has "exceeded the bounds of reason" or it can "fairly be said" that no judge would reasonably make the same order under the same circumstances." (*Marriage of Smith* (1990) 225 Cal.App.3d 469, 480.) "So long as the court exercised its discretion along legal lines, its decision will not be reversed on appeal if there is substantial evidence to support it." (*Ibid.*) We resolve all conflicts in the evidence in favor of Alicja, the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings. (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 31.)

Paul failed to provide legal analysis in his brief with respect to his position that the court erred in granting the DVRO requested by Alicja. Paul merely reminds this court that the trial court found Alicja to be not credible, and that she is a vexatious litigant who causes constant discord. Also, in his opening brief, Paul represented, "The trial court did not specify what facts led to the granting of the Domestic Violence Restraining Order against [him]." This is not true, however, as the trial court— while issuing the DVRO against Paul—stated, "Based on what [Alicja] [and] what Paula . . . said, I think it's apparent that there

15

is sufficient abuse, harassment, and intentional disturbing the peace here to grant a [DVRO] against [Paul]." The parties' daughter testified that Paul "doesn't talk about [Alicja] so kindly" and yells things to Alicja such as, "Why don't you move out? Go back to Poland"; Paula informed the court that this type of yelling by Paul at Alicja took place just "a few days ago." Alicja provided multiple examples of feeling harassed by Paul, such as Paul slamming her iron gate, yelling embarrassing things to her for other tenants to hear, painting the stairs outside her unit without first notifying her, etc. It was for the trial court to weigh the evidence and consider the demeanor and credibility of the witness, as "credibility issues [are] routinely resolved by [the] trier[] of fact." (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 182.) We believe the evidence and testimony elicited at the proceedings of December 11 and 12, 2017 support the trial court's issuance of the restraining order against Paul.

On this record, we cannot say the court abused its discretion. There was substantial evidence of Paul's past acts toward Alicja, which constituted threatening and harassing behavior.

B. *"Dwelling" in Welfare and Institutions Code[16] Section 15657.03, Subdivision (b)(4)(B), Encompasses the Residence, i.e., Apartment Unit of the Protected Person, and not the Entire Apartment Building.*

Paul contends the trial court erred by limiting its definition of "dwelling" to the apartment unit in which he resides but not

---

[16] All further statutory references are to the Welfare and Institutions Code, unless otherwise stated.

the entire apartment building in which he, and other tenants and Alicja, reside.

"Issues of statutory construction present questions of law, calling for an independent review by an appellate court." (*Botello v. Shell Oil Co.* (1991) 229 Cal.App.3d 1130, 1134.) To determine whether the trial court correctly interpreted and applied the Elder Abuse and Dependent Adult Civil Protection Act (§ 15600, subd. (a))—enacted to protect elders and dependent adults from abuse, neglect, and abandonment—review is de novo. (*Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1094.)

Pursuant to the Elder Abuse Act, "[a]n elder or dependent adult who has suffered abuse . . . may seek" an "order excluding a party from the petitioner's residence or dwelling." (§ 15657.03, subds. (a)(1) and (b)(4)(B).)[17] The trial court may issue an order under this section so long as the court is provided "reasonable proof of a past act or acts of abuse of the petitioning elder." (*Id.*, subd. (c).)

An "elder" is defined as a California resident, age 65 years or older. (§ 15610.27.) "Abuse" of an elder is defined as "[p]hysical abuse, neglect, abandonment, isolation, abduction, or other treatment with resulting physical harm or pain or mental

---

[17]     Section 15657.03, subdivision (a)(1) states, in relevant part, that an elder who has suffered abuse, as defined in Section 15610.07, may seek a protective order "excluding a party from the petitioner's residence or dwelling, except that this order shall not be issued if legal or equitable title to or lease of, the residence or dwelling is in the sole name of the party to be excluded, or is in the name of the party to be excluded and any other party besides the petitioner." (*Id.*, subd. (b)(4)(B).)

17

suffering." (§ 15610.07, subd. (a)(1).) "Financial abuse" of an elder occurs when someone "[t]akes, secretes, appropriates, obtains or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both." (§ 15610.30, subd. (1)(1).) Here, Paul—82 years old and a resident of California—qualified as an "elder" under the Elder Abuse Act at the time the incidents occurred. The trial court found he suffered financial abuse from Alicja when she intercepted his rent check for $1200 and there is "a long pattern of abuse and actions from [Alicja] towards [Paul] that arise to the level of awarding an [EARO]." Paul and Parker each testified that Alicja interferes with the maintenance and management of the 123 24th Street building, in that she has caused the water and/or electricity to be turned off. Based on the evidence provided during trial, it appears Alicja has been to Paul's apartment inappropriately and/or without his permission. All of the aforementioned testimony and evidence elicited during the proceedings of December 11th and 12th lend support to the trial court's decision granting the EARO against Alicja, requiring her to stay at least 100 yards away from Paul in general, and at least 10 yards away from him in the apartment building in which they both reside in.

Despite extensive research, we are unable to find case law upholding the exclusion of the restrained person from the apartment building, not just unit, of the protected party; as it pertains to the Elder Abuse Act, it appears the term "dwelling" has not yet been construed to also include the apartment building in which the protected party's (and restrained party's) apartment units are located in. "Courts have looked far afield for aids in construing statutes in such a way that language, which at first glance seems vague, acquires certainty. Therefore, we proceed to

18

examine what help we can get from sources other than the statute itself."  (*In re Davis* (1966) 242 Cal.App.2d 645, 653.)

According to the Revenue and Taxation Code, section 218, a "dwelling" means "a building, structure, or other shelter constituting a place of abode . . . and any land on which it may be situated. *A two-dwelling unit shall be considered as two separate single-family dwellings.*"  (Rev. & Tax. Code, § 218, subd. (c)(2)(A), italics added.)  Per the Fair Housing Act, a "dwelling" is defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."  (42 U.S.C.A. § 3602(b).)  A " 'residential building' is a building which is used for residential purposes or in which people reside, dwell, or make their homes, as distinguished from one which is used for commercial or business purposes.  The word 'residence' is one of multiple meanings, however, and hence the context in which it is used must be taken into consideration in determining its meaning in any particular case."
(20 Am.Jur.2d (2005) Covenants, Etc. § 179, pp. 178–179,
fn. omitted.)  And finally, Black's Law Dictionary defines "dwelling-house" as the "house or other structure in which one or more people live; a residence or abode."  (Black's Law Dict. (10th ed. 2014), p. 619.)

Based on the foregoing definitions provided, we believe individual apartments in a multi-unit building are dwellings, but that the building—as a whole—is not.  Yes, an apartment building is "*a* dwelling," but section 15657.03(b)(4)(B) specifies "*petitioner's* residence or dwelling."  In the context of elder abuse protective orders and/or section 15657.03(b)(4)(B), we believe a court is empowered to order the restrained party to stay away and/or move out from the protected party's

19

abode/residence/dwelling, words which we believe, in this context, are interchangeable. Although an apartment building—here, the 123 24th Street building—may also be characterized as "a dwelling," it is not "petitioner's . . . dwelling." Rather it contains many dwellings, including that of Paul (the petitioner) and Alicja.

We therefore agree with the trial court's interpretation of the meaning of "dwelling."

C. *The Court's Issuance of the DVRO and EARO Did Not Amount to Mutual Restraining Orders that Require Specific Findings of Fact.*

Paul argues reversal is required because the trial court did not make the detailed findings of fact required by Family Code, section 6305. This is a question of law which we review de novo. (*Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 779–780.)

We begin with one of the statutory schemes at issue.[18] "California law regulates the issuance of *mutual* restraining orders under the DVPA by subjecting them to additional procedural requirements. ([Fam. Code,] § 6305.)" (*Conness v. Satram* (2004) 122 Cal.App.4th 197, 200 (*Conness*).) "A court may not enter 'a mutual order' restraining the parties from further acts of abuse unless '(1) [b]oth parties personally appear and each party presents written evidence of abuse of domestic violence' using a mandatory Judicial Council form, and '(2) [t]he court makes detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted

---

[18]     Alicja filed a request for DVRO under the Family Code's DVPA (Fam. Code, § 6200 et seq.), which the trial court granted on December 12, 2017 along with Paul's requested EARO.

20

primarily in self-defense.' " (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 367–368 (*Melissa G.*); Fam. Code, § 6305, subd. (a)(1), (2).) "Permitting courts to avoid making the required findings . . . risks undermining central policies behind the factfinding requirement . . . ensuring courts do not issue mutual orders as a matter of expediency, or simply because an abused party, in order to get their own protection, yields to their abuser's request for a mutual order." (*Melissa G.,* at p. 372.)

If the court, however, enters mutual restraining orders "without making the required factual findings, it acts in excess of its jurisdiction and the order is voidable." (*Melissa G., supra*, 27 Cal.App.5th at p. 368.) The phrase "mutual order" may refer to "a single order restraining two opposing parties from engaging in the acts of abuse . . . or two separate orders which together accomplish the same result as a single order." (*Ibid.*) However, two restraining orders entered proximately in time but following separate hearings on different dates do not fall under the definition of a "mutual order." (*Conness, supra*, 122 Cal.App.4th at pp. 202–204.)

The second statutory scheme at issue, section 15657.03,[19] however, does not require the court to make a "primary aggressor" finding of fact if the orders issued were in fact mutual restraining orders; section 15657.03 does not have any additional safeguards for the issuance of "mutual" restraining orders.

---

[19] Paul filed a request for EARO under the Welfare and Institution Code's Elder Abuse and Dependent Adult Civil Protection Act (§ 15600 et seq.), which the trial court granted on December 12, 2017 along with Alicja's requested DVRO.

Paul asserts the court erred by issuing what he deems "mutual" restraining orders without making "detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense." (Fam. Code, § 6305, subd. (a)(2).) Family Code section 6305, however, is a provision of the DVPA and applies only to mutual restraining orders issued thereunder. Alicja obtained a restraining order under the DVPA, but Paul obtained a restraining order under the elder abuse law. (§ 15657.03, subds. (a)(1) & (c).) These were not mutual restraining orders because they were authorized by two different statutory schemes. Therefore, the trial court's decision not to designate a primary aggressor is affirmed.

D. *Although Alicja's Attachment of a Confidential Custody Evaluation Report to her Appellate Brief is Sanctionable Conduct, We Refrain from Imposing Sanctions as It Would Create an Unreasonable Financial Burden on Her.*

By way of our order dated February 11, 2019, we advised Alicja that we are considering the imposition of sanctions against her on the ground that she made an "unwarranted disclosure of a written confidential report," i.e., a confidential child custody evaluation report, by attaching one to her brief filed with this court. (Fam. Code, § 3111, subd. (d); Cal. Rules of Court, rule 8.276(a)(1) and (e).)

A disclosure is unwarranted "if it is done either recklessly or maliciously, and is not in the best interests of the child." (Fam. Code, § 3111, subd. (f).) The court "*may* impose a monetary sanction against the disclosing party," i.e., Alicja, "in an amount sufficient to deter repetition of the conduct." (*Id.*, subd. (d), italics added.) Said sanction "may include reasonable attorney's fees, costs incurred, or both, unless the court finds that the

22

disclosing party acted with substantial justification or that other circumstances make the imposition of the sanction unjust. The court *shall not* impose a sanction . . . that imposes an unreasonable financial burden on the party against whom the sanction is imposed." (*Ibid.*, italics added.)

In her supplemental briefing and/or opposition to the imposition of sanctions against her, Alicja stated the documentation attached to her brief[20] "is not a child custody evaluation report but a Brief Family Herriott Evaluation Report." She argued that her disclosure was "permissible under Family Code [section] 3111, [subdivision] (c)." (Boldface omitted.) Paul argued, however, that the imposition of sanctions against Alicja is warranted because she knew the report is a custody evaluation report that is confidential; Paul argued that the first page of the custody evaluation report includes language regarding the confidential nature of the report,[21] and that Alicja "intentionally removed these cautionary words" prior to her dissemination of same by filing three pages of said report as part of her appellate brief, making it public record.

---

[20] The brief we are referring to is Alicja's brief filed November 9, 2018, entitled "Respondent's Brief."

[21] Dr. Stan J. Katz, Ph.D.,'s confidential child custody evaluation report includes the following language: "CONFIDENTIAL, DO NOT DUPLICATE FOR DISTRIBUTION – ALL INFORMATION CONTAINED HEREIN SHOULD BE KEPT FROM CHILDREN."

Although Alicja apologized for including pages from the custody evaluation report during oral argument on February 26, 2019, and claimed to have done so with no bad intent, the fact remains that she made an unwarranted disclosure of a written confidential report.  Paul relied on the recently decided case *In re Marriage of Anka & Yeager*, where our colleagues in Division 6 of this court upheld the sanctions order of $50,000 against wife's attorney for her wrongful inclusion of a child custody evaluation. (See *In re Marriage of Anka & Yeager* (2019) 31 Cal.App.5th 1115, 1117, 1121-1123.)  However, the Court of Appeal reversed the order for sanctions against the wife as "[t]here [was] nothing in the record to suggest [Wife] directed or even encouraged [her attorney] to disclose privileged information."  (*Id.* at pp 1123.)

Unlike the wife in *Marriage of Anka and Yeager*, we are lead to believe that Alicja *knew* her actions would result in the disclosure of at least a portion of the confidential custody evaluation report.  It is apparent to us that the confidential report was tampered with as the cautionary words "CONFIDENTIAL" and "DO NOT DUPLICATE FOR DISTRIBUTION" were removed from the face of the page; this demonstrates to us that this disclosure was done intentionally and/or maliciously, per Family Code section 3111, subdivision (f). Based on the foregoing, we cannot find that Alicja acted with "substantial justification" in disclosing various pages from the confidential child custody evaluation report. (Fam. Code, § 3111, subd. (d).)

24

Although an unwarranted disclosure of a written confidential report has been made, we do not impose sanctions pursuant to Family Code section 3111 against Alicja as it would "impose[] an unreasonable financial burden" on her. (Fam. Code, § 3111, subd. (d).) The record before us included an Income and Expense Declaration dated and signed by Alicja on December 5, 2017, in which Alicja declared she receives gross monthly social security disability income in the amount of $650. During oral argument, Alicja argued that any imposition of sanctions would be improper as her only source of income is the social security disability she receives, and she has no other means to pay. Alicja brought to the court's attention that she has a fee waiver on appeal, as she cannot afford to pay the filing fees. Thus, although we believe Alicja's attachment of the confidential custody evaluation report to her appellate brief is sanctionable conduct, we will refrain from imposing sanctions as it would create an unreasonable financial burden on her.[22]

---

[22] Unlike the sanctioned attorney in *Marriage of Anka and Yeager* where "she made no effort to introduce [any] evidence" about her ability to pay, here we were provided with at least some information regarding Alicja's financial circumstances and ability—or rather, inability—to pay any amount of sanctions.

**DISPOSITION**

The orders are affirmed.  The parties are to bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION**


STRATTON, J.

We concur:



BIGELOW, P. J.



GRIMES, J.