Filed 3/25/24  Urrutia v. Wallens CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| IDOYA URRUTIA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ASHLEY JORDAN WALLENS,<br><br>Defendant and Appellant. | B319415<br><br>(Los Angeles County<br>Super. Ct. No. BD604471) |

APPEAL from an order of the Superior Court of Los Angeles County.  Mark A. Juhas, Judge.  Affirmed.

Ashley Jordan Wallens, in pro. per., for Defendant and Appellant.

Pamela Rae Tripp for Plaintiff and Respondent.

————————————————

## INTRODUCTION

Appellant Ashley Jordan Wallens appeals from a domestic violence restraining order issued against him under the Domestic Violence Prevention Act (DVPA; Fam. Code,[1] § 6200 et seq.) to protect his former wife, respondent Idoya Urrutia, their minor son, and Urrutia's current husband. Among other arguments, Wallens asserts the order must be reversed because the trial court denied his right to competent counsel and a fair trial, made erroneous evidentiary rulings, and punitively included his minor son as a protected person. Urrutia argues Wallens's appeal is moot, and even if not moot, his claims lack merit. We conclude the appeal is not moot; however, the trial court did not abuse its discretion in granting the restraining order, and Wallens has not demonstrated any reversible error. We accordingly affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      The parties

Wallens and Urrutia were married and have one child together, X.W. The parties separated in 2014, and divorced in 2015. Wallens later married Devrie DeMarco, and Urrutia married Philip Pearson.

In 2021, Wallens and DeMarco divorced following a series of domestic violence incidents between them. They obtained domestic violence restraining orders against one another in July 2021, and X.W. was included as a protected person in the order issued against DeMarco.

---

[1]      Unless otherwise stated, all further statutory references are to the Family Code.

## II. The events leading to Urrutia's request for a domestic violence restraining order

As of November 2021, Wallens and Urrutia shared joint custody of X.W., who was then 12 years old. Wallens had custody from Thursday afternoons through Sunday afternoons, and Urrutia had custody the rest of the week plus one weekend per month. Wallens also had a scheduled Zoom call with X.W. on Wednesday afternoons to assist the child with his schoolwork.

On November 10, 2021, X.W. missed his Zoom call with Wallens. At that time, X.W.'s stepfather, Pearson, who is a physician, needed to use the study where the computer was located for a telehealth appointment with a patient. When X.W. failed to attend the call, Wallens sent the child a series of e-mails, which culminated in Wallens cancelling any future study sessions with X.W. The e-mails caused X.W. to cry and to express to Urrutia that he felt afraid of his father. That same day, Wallens also sent a series of text messages to both Urrutia and Pearson in which he called them vulgar and derogatory names, and made comments about contacting the hospital where Pearson worked. Urrutia responded to Wallens in a message through the Our Family Wizard (OFW) platform, which stated, "Your harassing texts and messages need to stop now."

The following day, after consulting with X.W.'s therapist, Urrutia advised Wallens in another OFW message that X.W. was scared and wanted a break from seeing him that weekend. In response, Wallens sent Urrutia a series of text messages in which he accused her of kidnapping X.W. and threatened to call the police. Wallens also made reference to contacting the employers of both Urrutia and Pearson. After receiving the texts, Urrutia decided to stay overnight at a hotel with Pearson and

3

X.W.  X.W. contacted Wallens by phone later that night, and after the call, Urrutia observed that X.W. was distraught and appeared to be scared.  A week later, on November 17, 2021, Wallens again sent Urrutia a number of texts that she perceived as threatening in nature.

On November 22, 2021, Urrutia filed a request for a domestic violence restraining order against Wallens.  On that date, the trial court issued a temporary restraining order (TRO) against Wallens that named Urrutia, Pearson, and X.W. as the protected persons.  After Wallens was served with the TRO, he did not have contact with Urrutia or Pearson.  Wallens did, however, leave a voicemail message for Urrutia's parents in which he stated that he could not talk to Urrutia and Pearson directly, but that he intended to call the police if they did not return X.W. to him.  Wallens also sent text messages to Urrutia's brother in which he warned that law enforcement and the employers of Urrutia and Pearson would be contacted about the kidnapping of X.W.

### III.  The trial court's ruling on the request for a domestic violence restraining order

In January 2022, the trial court held a three-day hearing on Urrutia's request for a domestic violence restraining order.  Both Urrutia and Wallens attended the hearing and were represented by counsel.  At the start of the third day, however, Wallens decided to relieve his counsel and represent himself.

A total of four witnesses—Wallens, Urrutia, Pearson, and the process server for the TRO—testified at the hearing.  The trial court took judicial notice of the domestic violence restraining orders and related pleadings that were filed in the proceeding between Wallens and his second wife, DeMarco.  The court also

4

admitted into evidence Wallens's various written communications with Urrutia, Pearson, and X.W. in November 2021 following the missed Zoom call. However, none of the exhibits admitted into evidence at the hearing are included in the record on appeal.

In his testimony, Wallens acknowledged that he and DeMarco had a history of domestic violence that resulted in the issuance of mutual restraining orders in July 2021, but he denied that he was ever the aggressor or that X.W. witnessed any of the abuse. Wallens also admitted that he sent a number of angry messages to Urrutia and Pearson in November 2021 after X.W. missed their Zoom call, and that he tried to contact Urrutia's family after being served with the TRO. He maintained, however, that none of these communications were intended to be threats. Wallens testified, "I felt bad for my words. I'm not proud of them. I'm not going to lie. I genuinely believed that I did not threaten anyone, and I did not repeat or escalate anything."

At the hearing, both Urrutia and Pearson testified that they felt threatened by Wallens's communications. According to Pearson, after receiving the November 10, 2021 text messages, he feared for his safety. He also was concerned Wallens would follow through on his threat to contact Pearson's employer in an effort to defame him. Urrutia likewise testified that Wallens's various text messages to her in November 2021 caused her to feel afraid for herself and her family. Based on the erratic nature of the messages, Urrutia believed Wallens was "out of control" and was "coming after [her] family." She also feared Wallens would contact her employer because she was aware that he engaged in similar conduct with DeMarco. Urrutia further testified that X.W. expressed that he felt scared of Wallens after receiving his

e-mail messages and speaking to him on the phone. According to Urrutia, immediately following the November 11, 2021 telephone conversation with Wallens, X.W. "crumpled in [her] arms" and was "emotionally distraught and just so scared." In addition, Urrutia testified that, during the last year of the marriage, there were times when she feared for her safety because Wallens was a heavy drinker, had anger issues, and tended to act erratically.

The trial court found by a preponderance of the evidence that Wallens was a perpetrator of domestic violence. The court noted that it had "significant concerns about Mr. Wallens's credibility," that there was an existing restraining order against Wallens based on domestic violence with DeMarco, and that Wallens had shown himself to be "entirely unpredictable," both in how he handled the missed call with X.W. and comported himself in the courtroom. The court issued a five-year domestic violence restraining order against Wallens with Urrutia, Pearson, and X.W. as the protected persons. The order prohibited Wallens from having any contact with Urrutia and Pearson except for the purpose of communicating about court-ordered visitation for X.W. and exchanging the child for the visits. The order restricted Wallens's contact with X.W. to supervised visits on two Saturdays per month from 4:30 p.m. to 7:30 p.m.

As the court was announcing the terms of the restraining order, Wallens attempted to ask a question. The court instructed Wallens to hold any questions until it finished setting forth its ruling. However, Wallens became increasingly disruptive during the hearing and was ordered by the bailiff to quiet down. At the conclusion of the hearing, the court stated that, although it had promised to answer his questions, Wallens "makes it impossible

6

for me to do that because I continuously get interrupted."
The court then adjourned the proceedings.

Wallens timely appealed. While the appeal was pending, Urrutia filed a motion to dismiss the appeal as moot.

## DISCUSSION

### I.     Urrutia's motion to dismiss the appeal

We first address Urrutia's motion to dismiss the appeal. Urrutia argues the appeal has been rendered moot by subsequent orders that restrict Wallens from having any contact with X.W. or Urrutia. Those subsequent orders consist of (1) a July 26, 2022 order terminating visitation between Wallens and X.W.; and (2) a July 28, 2022 criminal protective order prohibiting Wallens from contacting Urrutia for a three-year period. Because Wallens did not file an appeal from those orders, Urrutia asserts this court cannot provide him with any effective relief from the domestic violence restraining order even if we were to find reversible error.

"A case becomes moot when events ' "render[] it impossible for [a] court, if it should decide the case in favor of [appellant], to grant him any effect[ive] relief." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276.) In this case, the January 13, 2022 domestic violence restraining order at issue on appeal includes Urrutia, Pearson, and X.W. as protected persons, and is in effect for a five-year period until January 13, 2027. In contrast, the July 26, 2022 family law order only applies to visitation with X.W., and the July 28, 2022 criminal protective order only applies to contact with Urrutia for a period of three years. Because the domestic violence restraining order is broader in scope and/or longer in duration than the subsequent orders, a decision in favor of Wallens could provide him with some effective relief. Under

7

these circumstances, Wallens's appeal is not moot, and we therefore deny Urrutia's motion to dismiss the appeal.

## II.    Wallens's challenge to the domestic violence restraining order

Wallens raises several claims regarding the domestic violence restraining order.  He contends the order must be reversed because the trial court (1) denied his right to competent counsel after his attorney resigned; (2) denied his right to a fair trial by refusing to answer any questions at the conclusion of the hearing; (3) denied his right to cross-examine his second wife, DeMarco; (4) improperly allowed evidence of his alleged conduct during his marriage to Urrutia; (5) improperly credited Urrutia's testimony even though new evidence shows she lied about a certain telephone call; and (6) effectively ended his relationship with X.W. by including the child as a protected person in the restraining order.  We conclude Wallens's claims lack merit.

### A.    Governing law on the DVPA

The DVPA authorizes the court to issue a protective order " ' "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved," upon "reasonable proof of a past act or acts of abuse." ' " (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 115.)  The DVPA defines "domestic violence" as "abuse perpetrated against," among others, a spouse or former spouse.  (§ 6211, subd. (a).)  "Abuse is not limited to the actual infliction of physical injury or assault" (§ 6203, subd. (b)), but also extends to "behavior that has been or could be enjoined pursuant to Section 6320" (§ 6203, subd. (a)(4)).  Section 6320, in turn, includes within conduct that may be enjoined, "threatening, . . . harassing, . . . contacting, either directly or indirectly, by mail

8

or otherwise, . . . or disturbing the peace of the other party, and . . . other named family or household members." (*Id.*, subd. (a).) Under the DVPA, " '[a]nnoying and harassing an individual is protected in the same way as physical abuse.' " (*In re Marriage of Brubaker & Strum* (2021) 73 Cal.App.5th 525, 536.)

We review the grant or denial of a domestic violence restraining order for abuse of discretion. (*In re Marriage of D.S. & A.S.* (2023) 87 Cal.App.5th 926, 933; *Herriott v. Herriott* (2019) 33 Cal.App.5th 212, 223.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' " (*In re Marriage of D.S. & A.S.*, at p. 933.) " ' "So long as the court exercised its discretion along legal lines, its decision will not be reversed on appeal if there is substantial evidence to support it." ' [Citation.] We resolve all conflicts in the evidence in favor of . . . the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings." (*Herriott v. Herriott*, at p. 223.)

## B. The trial court did not abuse its discretion in issuing the domestic violence restraining order

It is a fundamental rule of appellate review that an appealed order is presumed to be correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) To overcome this presumption, the appellant must provide an adequate record demonstrating error. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140–1141.) " ' "[A] record is inadequate . . . if the appellant predicates error only on the part of the record he [or she] provides the trial court, but ignores or does not present to the appellate court portions of the proceedings below which may provide grounds upon which the decision of the trial court could be affirmed." ' " (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014)

229 Cal.App.4th 635, 644.) "Where the appellant fails to provide an adequate record of the challenged proceedings, we must presume that the appealed . . . order is correct, and on that basis, affirm." (*Ibid.*) Additionally, " ' "the party asserting trial court error may not . . . rest on the bare assertion of error but must present argument and legal authority on each point raised. [Citation.]" [Citations.] When an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' " (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)

Here, Wallens claims the trial court committed errors in granting a domestic violence restraining order. Wallens does not, however, support his claims of error with any citations to legal authority or to the record on appeal. Moreover, Wallens has failed to provide an adequate record to show there was reversible error. The record does not include Urrutia's application for a restraining order or any supporting documentation, or any of the exhibits admitted into evidence at the hearing before the trial court. Most notably, the record fails to include any of the text, e-mail, or other written communications that Wallens had with Urrutia, Pearson, and X.W. in November 2021, which gave rise to Urrutia's request for a restraining order against Wallens. Despite the significance of those writings to the trial court proceedings, the only evidence in the appellate record regarding their content is the witnesses' testimony confirming certain excerpts and describing their effect on the recipients. Nevertheless, based on the limited record that Wallens has provided, we conclude the trial court acted within its broad discretion in issuing the restraining order.

10

The testimony at the hearing supported a finding that, when X.W. missed a single Zoom call, Wallens responded by sending a number of threatening and harassing communications to Urrutia and her family. In his text messages to Urrutia and Pearson, Wallens called them offensive names, accused them of kidnapping X.W., and threatened to report them to the police and their places of employment. Both Urrutia and Pearson testified that Wallens's texts caused them to feel threatened and afraid for their safety. Urrutia also testified that, after receiving Wallens's e-mail messages and speaking to him on the telephone, X.W. was emotionally distraught and expressed that he feared his father. Although Wallens stopped communicating with Urrutia and Pearson after being served with the TRO, he left messages for Urrutia's parents and sibling in which he again claimed that Urrutia and Pearson kidnapped X.W. and threatened to call their employers. In addition, at the time of the hearing, there were mutual domestic violence restraining orders in place to protect Wallens and his second wife, DeMarco, from one another.

In his testimony, Wallens denied that he intended for any of his communications to be perceived as threats. He also denied that he engaged in domestic violence against DeMarco or anyone else, and testified that X.W. was never exposed to any domestic violence in his home. In granting the request for a restraining order, however, the trial court expressed that it had "significant concerns about . . . Wallens's credibility" based on his testimony. As this court has explained, "[i]t was for the trial court to weigh the evidence and consider the demeanor and credibility of the witness[es]." (*Herriott v. Herriott, supra,* 33 Cal.App.5th at p. 223.) On this record, the testimony elicited at the hearing supported the trial court's ruling.

11

While Wallens asserts several claims of error on appeal, none have merit. With respect to his claim that he was denied his right to competent counsel, "the general rule is that there is no due process right to counsel in civil cases." (*Walker v. State Bar* (1989) 49 Cal.3d 1107, 1116.) The record further shows that, on the third and final day of the hearing, Wallens chose to relieve his counsel and represent himself. With respect to his claim that he was denied the right to a fair trial because the trial court refused to answer his questions, the record reflects that, by the conclusion of the hearing, the court determined it was no longer feasible to try to respond to Wallens's questions given his increasingly disruptive behavior.

With respect to his claims of evidentiary error, Wallens contends the trial court precluded him from cross-examining DeMarco. However, neither party called DeMarco to testify at the hearing. Wallens also argues the trial court erred in allowing Urrutia to testify about his alleged abusive conduct during their marriage, which ended in 2014. This argument fails because the testimony in question was limited in scope and was relevant to explaining why Urrutia felt threatened by Wallens's similarly erratic conduct in 2021. Wallens further asserts the trial court improperly credited Urrutia's testimony about a November 11, 2021 telephone call between X.W. and Wallens, even though new evidence in the form of cell phone records shows that such call never took place. As Wallens acknowledges, this evidence was not presented to the trial court during the January 2022 hearing. Thus, it is not relevant to the current appeal.

Finally, Wallens claims the trial court acted in a punitive manner by naming X.W. as a protected person in the restraining order. Wallens contends this ruling had the effect of ending his

parental relationship with X.W.  We disagree.  In ruling on a request for a domestic violence restraining order, the court also has broad discretion to "make an order for the custody of a child . . . that seems necessary or proper."  (§ 3022; see *Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 661.)  "The guiding principle for the court in making any custody or visitation order is that the order must be in the child's best interest."  (*Celia S. v. Hugo H.*, at p. 661.)  Here, the record reflects that, in granting the restraining order against Wallens, the trial court limited Wallens's contact with X.W. to supervised visits twice per month for three hours per visit.  Given Urrutia's testimony about Wallens's erratic and harassing behavior and the severe emotional impact it had on X.W., the trial court reasonably could conclude that an order for supervised visitation was in the child's best interest.  On this record, the trial court's issuance of the domestic violence restraining order was not an abuse of discretion.

## DISPOSITION

The domestic violence restraining order issued against Wallens is affirmed.  Urrutia shall recover her costs on appeal.


VIRAMONTES, J.


WE CONCUR:



STRATTON, P. J.



GRIMES, J.


13