Filed 5/30/23  A.A. v K.A. CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| A.A., a Minor, etc.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>K.A.,<br><br>    Defendant and Respondent. | D079506<br><br><br>(Super. Ct. No. 20FDV01515C) |

APPEAL from an order of the Superior Court of San Diego County, Marcella O. McLaughlin, Judge.  Affirmed as modified.

N.D., in pro. per., on behalf of A.A. as guardian ad litem, for Plaintiff and Appellant.

Linda Cianciolo for Defendant and Respondent.


## INTRODUCTION

A.A., through her guardian ad litem[1] and maternal aunt, N.D. (GAL), appeals from an order denying her application for a domestic violence

---

[1]    Although not asserted by Father in his responding brief on appeal, we question whether N.D., in her role as guardian ad litem, may proceed in

restraining order (DVRO) against her father, K.A. (Father). She asserts five claims of error, all which are either not cognizable on appeal or supported by the record. We therefore conclude A.A. has not met her burden of establishing any reversible error, and that the trial court did not abuse its discretion by denying her application for a DVRO. However, the trial court's award of attorney fees to Father was unauthorized because GAL is not a party to the action. We shall affirm the trial court's order denying the DVRO but vacate the award of the attorney fees.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Family Law Case*

This appeal—the third from this family law case—arises from a long, contentious custody battle between L.R. (Mother)[2] and Father in what is now a seven-year-old dissolution case.[3] Mother filed a petition for dissolution on

---

propria persona on appeal without violating the prohibition against the unauthorized practice of law. (See *J.W. v. Superior Court* (1993) 17 Cal.App.4th 958, 962 ["a non[-]attorney who represents another person in court proceedings violates the prohibition against unauthorized practice of law"]; Code Civ. Proc., § 374 ["a minor under 12 years of age, accompanied by a duly appointed and acting guardian ad litem, shall be permitted to appear in court without counsel for the *limited purpose* of requesting or opposing a request for . . . a protective order" (italics added)].) However, considering the age of this matter and the parties' respective interests in finality, we exercise our discretion to reach the merits of the appeal to promote the ends of justice.

[2] Mother is not a party to this appeal and is discussed only when relevant.

[3] On our own motion, we take judicial notice of the register of actions in San Diego Superior Court case number D557861 pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a).

October 26, 2015.  As best as we can determine from the record before us, other than a status-only judgment terminating the marriage entered on November 1, 2018, there has been no trial or judgment entered on any issues, including child custody and visitation.  Under the current *pendente lite* custody order, Father had sole legal and sole physical custody of the couple's now 12-year-old daughter, A.A.  Mother had supervised visitation.

## II.

### *A.A.'s Application for a DVRO Against Father*

A.    *The Application (DV-140 Form)*

On April 20, 2020, in the midst of the parents' custody dispute, A.A. filed an application for a DVRO against Father through GAL.  A.A. was nine years old when she sought the DVRO.

GAL filed a supporting declaration that summarized A.A.'s alleged complaints of abuse while in Father's care.  GAL stated she watched "Zoom videos" that were recorded of professionally supervised visitations between Mother and A.A. in March and April 2020 (Zoom videos) "showing [A.A.] complaining of being abused by [F]ather."  GAL then stated she "accurately transcribed the relevant portions" of A.A.'s complaints from the videos, as follows.

On March 29, 2020, A.A. allegedly stated:  " 'a lot of bad things happen like before he has grabbed me here and stuff and has thrown me on the bed and stuff and I get hurt a lot here . . . '  The video shows her eating a rotten apple, and her complaining that 'I just don't have anything to eat really.  And I know like it's not really use asking him because he's just going to say no.' "  (Boldface omitted.)

On April 1, 2020, A.A. allegedly stated:  " 'He hurts me a lot. . . .  He hurts me like when I do something he doesn't sometimes he'll grab me by my

3

arms and legs and carry me smashed together in his hands and drop me on the couch. And then sometimes, . . . he'll grab my ribs and then it feels like they're shrinking and I try to get away from him to stop, stop he never stops.' " (Boldface omitted.)

On April 5, 2020, A.A. allegedly stated: "Father strangles her, causing her to fall to the floor. Father hurts her and throws her on the bed and couch when he is upset." (Boldface omitted.)

On April 12, 2020, A.A. allegedly "point[ed] to bruises all over her legs and state[d] her Father caused them. Also, that [F]ather 'grabs me a lot and it really hurts he'll just throw me on the bed or couch or sometimes even the floor whenever he feels like it.' She also complains about him drinking." (Boldface omitted.)

On April 19, 2020, A.A. allegedly stated: " 'Like he'll grab me and . . . throw me on a bed, the floor, a couch usually on the floor and it's just really painful and he'll grab me by my arms and legs and like my ankles and my wrists. And he'll just carry me. And it looks like a Chocolate chip, like my back's the bottom and my feet and uh, and my wrists are like, the top of it. And then, um, he just like drops me. Sometimes he holds me by my ribs too, and feels like they're shrinking.' " (Boldface omitted.)

In the DVRO application, GAL requested her appointment as A.A.'s guardian ad litem and a change to the existing custody orders.

B.   *A Temporary Restraining Order (TRO) Is Denied*

On the basis of the allegations in the DVRO application, the trial court (Hon. Judge Lisa Rodriguez) denied A.A.'s request for a TRO, finding the alleged facts stated in the application "do not show a reasonable proof of a past act or acts of abuse." The court provided a lengthy explanation of its reasons for the denial:

4

"The court has read and considered the application and attachments as well as the associated [family law] court file, D557861. The court notes there is a significant history of unsubstantiated abuse alleged toward daughter by [F]ather and multiple attempts by Mother to undermine the relationship between [F]ather and minor child. Given that there is no corroborating CWS investigation or law enforcement action and that all of these allegations have been made with a supervisor present, the court does not find them credible at this time. This is a high conflict case with a history of allegations against [F]ather that have been fully litigated and investigated and resulted in a DV Restraining Order protecting [F]ather and child being issued by Judge McLaughlin on [February 27, ]2020. At this time, based on the above there is not sufficient credible evidence to grant the TRO."

The court set an evidentiary hearing on the matter for June 22, 2020.

C.    *The Evidentiary Hearing*

The evidentiary hearing eventually commenced on December 16, 2020, with Judge Marcella O. McLaughlin presiding, and concluded after five non-consecutive days on February 3, 2021. During the lengthy hearing, the trial court heard testimony from six witnesses—Father; A.A.[4]; GAL; another of A.A.'s maternal aunts, G.R.; a supervised visitation monitor, Leyla Kabban; and a third-party witness, S.F.—and received into evidence numerous exhibits, including video recordings and a psychological report by a court-

---

[4]    The trial court closed the courtroom to the public during A.A.'s testimony and ordered the transcript placed under seal, finding that the need to protect A.A.'s privacy overcame the public's right of access to the record. The court allowed counsel for A.A., GAL, and Father to be present during A.A.'s testimony. Although we have reviewed the transcript of A.A.'s testimony in deciding this appeal, it remains sealed and we do not include a recitation of her testimony in our factual summary.

5

ordered custody evaluator detailing A.A.'s relationship with Father and her maternal relatives.[5]

We summarize the relevant evidence next.[6]

---

[5] A.A. filed various motions to augment the record, including a motion to consider police body worn camera videos within Exhibit E dated April 23, 2020. She also moved to include a document apparently written by GAL, titled "My Plan to Heal this Family and Letters of Recommendation," that she did not attempt to lodge with the trial court during the evidentiary hearing. Finally, A.A. asked this court to take judicial notice of this court's unpublished opinion in *In re Marriage of L.R. and K.A.* (July 27, 2021, D077533). The court deferred decision as to these requests.

The request to augment the record to include videos related to Exhibit E is denied because they were not admitted into evidence and considered by the trial court. (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 681 [" 'Augmentation does not function to supplement the record with materials not before the trial court.' "].) The request to include the document titled "My Plan to Heal this Family and Letters of Recommendation" is denied because it was not admitted into evidence, nor is it relevant to the issues presented in the instant appeal. (*Ibid.*) A.A.'s request for judicial notice of the court's opinion in *In re Marriage of L.R and K.A., supra,* D077533 is denied because it is not relevant to the legal questions presented in the instant appeal. (*Save Lafayette Trees v. East Bay Regional Park Dist.* (2021) 66 Cal.App.5th 21, 29, fn. 2 [denying judicial notice of documents that "are not necessary to resolve th[e] appeal"].)

[6] In summarizing the evidence, "[w]e draw all reasonable inferences in support of the court's ruling and defer to the court's express or implied findings when supported by substantial evidence." (*J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 935.) "All conflicts in the evidence are drawn in favor of the judgment," and "[w]hen supported by substantial evidence, we must defer to the trial court's findings," including its finding on the credibility of witnesses, which is within the trial court's discretion. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364–365 (*Niko*).)

6

1. *Father's Testimony*

Father testified over the course of several days. He discussed the background of his relationship with A.A., in which he described "moments of great, healthy relationship building experiences." He stated that when A.A. is not around her maternal family, they share an "excellent, warm, relationship." But he also acknowledged that A.A. and Mother shared a "close emotional bond" that caused A.A. difficulty moving between Mother's and Father's homes.

Father described a particularly difficult time in his relationship with A.A. during the month following a change in A.A.'s custody schedule with Mother. During this period, Father and A.A.'s relationship was filled with "turmoil and grief and rage and d[y]sregulation." Father described incidents in which A.A. behaved aggressively and expressed hatred for him. On multiple occasions, A.A. punched and kicked Father and pulled his hair.

When A.A. hit Father, he held her arms because he did not want her to hurt herself and did not want A.A. to believe that violence is acceptable behavior. On more than one occasion, Father had to chase A.A. down the street and physically pick her up. Father explained that when he had to physically restrain A.A., he did so gently and with the intent of preventing A.A. from hurting herself or others.

Father described a particularly emotionally charged exchange in which police officers were present while he took A.A. from Mother's custody.[7] Law enforcement was also present during the exchange because Mother took physical custody of A.A. for 75 days in violation of the court's custody order.

---

[7]  This incident was video-recorded and entered into evidence as Exhibit 15.

During the incident, Father physically picked up A.A. and took her to a vehicle during what he described as an "exceptionally emotional scene."

Father explained that A.A. typically did not have such strong negative emotional reactions to him. A.A. generally had such reactions when she transitioned from Mother's care back to his care. Father acknowledged that he used physical force with A.A. during these transitions, but he claimed that he did so only in order to restrain her when she was being physically confrontational towards him.[8]

Father acknowledged that he made a decision to limit A.A.'s physical visitation with Mother even though he was aware A.A. would be "emotionally impacted" by this limitation. He explained that his decision was made during the Covid-19 pandemic because multiple members of A.A.'s maternal family were diagnosed with cancer and therefore at risk during the pandemic. Father also limited A.A.'s social interactions during the pandemic out of concern for A.A.'s paternal grandmother, who lived with them.

2.     *Leyla Kabban's Testimony*

Kabban, a court-appointed professional visitation monitor, supervised around 40 to 50 visits between A.A. and Father in 2019. Based on her observations of Father and A.A.'s interactions, Kabban testified she did not

---

[8]     Father, G.R., and S.F., also testified about another altercation. According to G.R. (A.A.'s other maternal aunt), she ran into Father and A.A. sitting outside a restaurant. A.A. ran towards G.R., jumped into her arms, and said, "Help me. Help me." G.R. described A.A.'s demeanor as "scared and desperate" and believed A.A. wanted help. G.R. testified that Father kicked and pushed her while she embraced A.A., which caused G.R. to fall backwards. Father denied G.R.'s claims and testified that he pulled A.A. out of G.R.'s grip to avoid what he believed may be a potential "abduction" attempt. S.F. (Father's friend) was present and testified that Father never pushed G.R., but he did scream at her to release A.A.

see Father treat A.A. inappropriately. By contrast, Kabban witnessed Mother "constantly bring up negative information" about Father, and she observed A.A. "acting out" against Father when she was transitioning from Father's care to Mother's care.

Kabban was aware that A.A. made allegations of abuse by Father, but she did not believe they were credible. For example, A.A. alleged that her bathroom at Father's house was full of spiders and that she had no clothes. Kabban personally observed A.A.'s bathroom to be clean and that A.A.'s closet was full of clothes. Kabban did not contact child protective services to report A.A.'s allegations because she did not believe A.A. was credible and she knew when A.A. was being "truthful or not truthful."

### 3.   *GAL's Testimony*

GAL's testimony was given over two days of the evidentiary hearing. During her testimony, the Zoom videos between A.A. and Mother were entered into evidence and played before the trial court. GAL believed A.A.'s demeanor showed she was "hopeless," "sad," and "depleted." In the videos, A.A. described instances in which Father grabbed her by the arms, legs, and ribs in a way that made her feel like her ribs were "shrinking." She complained of stomachaches while at Father's house and described instances in which Father hurt her by throwing her on the bed and the couch and suffocated her.

Based on her description of the way in which Father grabbed her wrists and feet, GAL testified she believed he may have "hogtied" A.A. GAL expressed concern at the force used by Father and believed that he was unable to control his anger without using force. However, GAL acknowledged that she has never personally seen Father physically attack or abuse A.A., aside from an exchange in the presence of law enforcement in which Father

9

picked up A.A. in a manner she considered abusive. GAL confirmed that she did not believe Father would intentionally hurt A.A.

GAL further opined that A.A. was in need of protection from the court because of Father's emotional abuse. She believed that Father emotionally abused A.A. by yelling at her and refusing to allow her to express emotions about Mother. She asserted that Father disturbed A.A.'s peace because he refused to leave A.A. alone when she expressed that she wanted to be left alone, and because he disparaged Mother knowing that she is an important person in A.A.'s life. GAL testified that Father stopped all visitation between A.A. and Mother during the pandemic, despite the "emotional distress" this caused A.A.

D. *The Trial Court's Ruling*

At the conclusion of the evidence, the trial court denied A.A.'s DVRO application from the bench. The court later issued a 19-page statement of decision and judgment, on July 14, 2021. We summarize the court's findings from its final, written statement of decision.

The court found that although the DVRO application was sought on the basis of allegations "characterized as physical abuse of the child by Father," at the hearing "the allegations of abuse were broadened and characterized to include disturbing the peace and emotional abuse." The new allegations were based on GAL's theory that Father "exhibits coercive control over the child and does not afford her even the basic liberty of peace, at best, and at worst is regularly physically abusive towards the child when he tries to control her." The court then stated these allegations, if believed, would establish behavior that could be enjoined under Family Code section 6320.[9]

---

9    All further unspecified statutory references are to the Family Code.

The court found that from the "considerable amount of evidence" presented over the five days: "[O]ne thing that is uncontroverted by all in this case is that [A.A.] . . . is the unfortunate victim of her circumstances. It is certainly apparent the toll the extreme conflict that has been created in the Family Law case and the deep animus that exists between her parents and the families has had a profound effect on [A.A.'s] life[.]" The court noted the "highlight" and "the most heartbreaking aspect" of the hearing was meeting A.A., whom the court described as "lovely and intelligent" but "obvious[ly] suffering." The court then stated it "cannot simply decide this case in a vacuum," and instead it was compelled to consider the circumstances of the family law case when it determines whether A.A., through her GAL, had met her burden of proof.

Although the court found A.A.'s testimony to be "heartfelt," in evaluating whether her testimony is "credible," the court stated that it needed to consider the issues of "alienation and triggering and a reinforcement of [A.A.'s] negative disposition towards Father that has occurred for years. There has been a history of disruptive events and trauma at which the child has been the central focus." In this regard, the court considered the March 31, 2019 court-ordered psychological evaluation report for child custody written by Dr. Steven N. Sparta for the family law case.[10]

---

[10] A.A. argues the trial court erred by admitting the psychological evaluation report because it was hearsay, and alternatively argues that the report was never entered into evidence. She takes issue with the contents of the report and argues the author of the report "should have been cross-examined." (Boldface omitted.) We reject this claim of asserted error because it is not supported by the record. The record reflects it was A.A.'s counsel who offered the report into evidence and that the parties stipulated to the admissibility of the report, and it was admitted.

11

The court, in evaluating A.A.'s credibility, drew from Dr. Sparta's descriptions of various events he observed that demonstrated "the child's discussions [about Father] illustrated contradictions and/or exaggerations in her critical statements" about Father. As examples: A.A. reported that Father took away all of her toys, but a visit to Father's home showed an "abundance" of toys and books. A.A. reported that Father "never at any time had taken her to the zoo." When Father showed Dr. Sparta and A.A. photographs he had of their trips to the zoo just the month before, A.A. denied that she was the child in the photographs. A.A. had reported that Father "had allegedly given her a time-out for a 10 hour period."

The court also considered Dr. Sparta's belief that A.A. may have been "coached about what to say" in a number of instances. As examples: He observed that A.A. was "exposed to conflict between the parents and aligned [herself] with the mother. The child was overly concerned about her statements [to him] becoming known to the mother." A.A.'s pediatrician refused to certify Mother's request to have A.A. see a different therapist because his "impression was that the child ha[d] been coached about what to say." During an incident at the child's school, school staff reported A.A. did not want to go with Father. A.A. was observed " 'to be assaultive to the father, going for his eyes, kicking him' " and " '[t]he child would slip notes, stating that the father was a liar and was hurting her.' " It was also observed that Mother was saying " 'horrible things [about Father] right in front of the child.' " In another incident at school, Mother stated " 'in front of the child "he's dragging it out, it's all for money, the child is suffering." ' "

The court also considered Dr. Sparta's opinion that A.A.'s negative "beliefs towards her Father, at least partly based on inaccurate, negative information were communicated in an emotionally coercive context, and the

12

child's allegations of physical force used by Father are inconsistent and contradictory." Dr. Sparta observed A.A. act in "a provocative, inappropriate manner towards the Father," and noted that he did not "become angry or retaliatory" in these moments. By contrast, Mother's " 'critical remarks about [Father] in the presence of [A.A.]' " caused A.A. distress. The court also noted that during Father's testimony at the evidentiary hearing, presented remotely over video, A.A. walked into Father's office into the camera frame several times and appeared "very playful" and "extremely comfortable" with Father.

Finally, the court considered Dr. Sparta's report that A.A. had once reported a bruise on her head, as she explained, " ' "so I can live with my mom." ' " The court found this as corroboration that "at least some of the child's negative accounts about her Father [were] motivated by her objective to live exclusively with her Mother."

In considering Dr. Sparta's report, the trial court acknowledged the report was from 2019 and the allegations before it "are more recent." However, the court stated it could not "ignore the powerful psychological impact that the last couple of years have had on [A.A.] as it relates to these [current] allegations of physical abuse." Moreover, the court found A.A.'s testimony and its own observations about A.A. to be consistent with Dr. Sparta's report. The court found A.A.'s answers to be "absolute and very extreme," such as stating "there was nothing that she could think about that she enjoyed doing with her father" and that she did not believe her father loved her. The court also considered the fact that Mother had "abduct[ed]" A.A. from Father's care for "over 70 days" in violation of a lawful court order and factored in Mother's exclusive control of A.A. during that period in evaluating A.A.'s credibility.

13

In evaluating the credibility of A.A.'s allegations of physical abuse by Father, the court found Exhibit 15, the video recording of the November 2020 custody exchange, to be "very important." The court explained that subsequent to the issuance of an arrest warrant for Mother (presumably related to the allegations of child abduction), "the District Attorney's Office assisted in recovering [A.A.]" and returned her to Father's care. The court saw in the video that A.A. was "incredibly emotionally upset" as Father tried to coax her into coming with him. Although "Father did pick [A.A.] up and . . . sling her over his shoulder," he tried to speak with her (even bending down to her level) before "physically removing her." During this time, "Mother's family . . . were screaming and yelling at them, including obscenities, and members of the public [who witnessed the scene] . . . were clearly upset."

Based on the totality of the evidence described by the trial court, it found the degree of any physical force Father has used to restrain A.A., including to prevent her from hurting herself when she is "very aggressive," failed to demonstrate that he "intentionally or recklessly caused or attempted to cause her bodily injury" within the meaning of section 6320.

Finally, the trial court found A.A. failed to establish through credible evidence that Father's conduct disturbed her peace through coercive control, including emotional abuse and "isolation from family and others." In reaching its finding, the court considered that there have been "numerous" child protective services referrals "that are unfounded on Father"; and Dr. Sparta's report that "Father, rather than Mother, has never reacted in any way that is inappropriate" in his presence. In its oral statement of decision from the bench, the court also found the conflict between Father and A.A.'s

14

maternal family provided context as to why Father would want to restrict A.A.'s contact with Mother's family.

In sum, the trial court found A.A., through her GAL, failed to meet her burden of proof to show there was any abuse under the Domestic Violence Prevention Act (DVPA; § 6200 et seq.) and denied the request for a DVRO against Father. The court granted Father's request for an award of attorney fees under former section 6344 and ordered the GAL to pay an amount of $5,000 at the rate of $150 each month until paid in full. A.A., through her GAL, timely appealed the order denying the DVRO and GAL also appeals the order awarding Father attorney fees.

DISCUSSION

I.

*Noncognizable Issues*

A.A., through her GAL, raises several issues that are not cognizable on appeal, and she fails to follow the rules of appellate procedure by not adequately citing to the trial court record. Although GAL is proceeding in propria persona on behalf of A.A., and we appreciate the inherent challenges in doing so, this does not exempt her from the rules of appellate procedure. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247.) We afford litigants proceeding in propria persona " 'the same, but no greater consideration than other litigants and attorneys.' " (*Ibid.*) "Appellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' " (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.) With this standard in mind, we conclude A.A. has not presented sufficient grounds for reversal on the following issues raised in her appeal.

15

First, A.A. asserts the trial court erred in its April 20, 2020 order denying her request for a TRO. Although A.A.'s notice of appeal indicates that she only appeals from the July 14, 2021 order denying her DVRO application (see Cal. Rules of Court, rule 8.100(a)(2) [A notice of appeal "is sufficient if it identifies the particular judgment or order being appealed."]), any appeal from the denial of the TRO would become moot when the trial court conducted a hearing on the merits of the request for a permanent restraining order (see *In re L.W.* (2020) 44 Cal.App.5th 44, 47, fn. 2 ["The appeal from the temporary restraining orders is technically moot because those orders terminated when the three-year restraining order was issued."]).

Second, A.A. asserts the trial court erred by denying Mother's motion to join in A.A.'s DVRO application on August 31, 2021. However, A.A. lacks standing to appeal the denial of Mother's motion because she is not "aggrieved" by the order, as her rights in the underlying DVRO matter were not affected by the denial of joinder. (Code Civ. Proc., § 902 ["Any party aggrieved may appeal" in civil matters."]; *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 [A party is considered aggrieved by an adverse judgment or order when their "rights or interests are injuriously affected by the judgment."].) Rather, the party with standing to appeal the denial of a motion for joinder is the party who was denied the right to intervene. (See *County of Alameda,* at p. 736 ["[O]ne who is denied the right to intervene in an action ordinarily may not appeal from a judgment subsequently entered in the case. [Citations.] Instead, he may appeal from the order denying intervention."].)

Further, here, Mother pursued her appellate remedies as the party who was denied joinder. The record reflects that after the joinder was denied, Mother filed a petition for writ of mandamus asking this court to order the

16

trial court to vacate its order denying the motion for joinder and enter an order granting the motion. (*Rhodes v. Superior Court of San Diego County* (Sept. 25, 2020, D077967) [nonpub. opn.].) This court denied the petition on September 25, 2020. (*Ibid.*) Accordingly, although A.A. does not have standing to appeal the order, this issue has already been decided in a prior proceeding, and collateral estoppel precludes the issue from being relitigated. (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943 [" 'Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings.' "].) We therefore dismiss this claim.

Lastly, A.A. asserts the trial court erred by limiting her counsel's discussion of unspecified emails authored by Father. She states that the emails included "several . . . examples of the violence and physical altercations in Respondent's home spanning from 2017, 2018 and 2019." However, it is unclear what part of the record she refers to, and she presents no legal argument to support her contention. Rather, she presents a personal narrative that is entirely outside the record. This assertion is also not properly supported by legal authority. For these reasons, we do not consider the merits of this claim. (See *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 ["In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record."].)

## II.

*The Trial Court Did Not Abuse Its Discretion*

*in Denying the DVRO Application*

While A.A.'s briefing on appeal presents arguments that are difficult to understand, we discern the intent of her contentions on appeal to be that the trial court misapplied the applicable legal standards, that its findings were not supported by substantial evidence, and that the court abused its discretion in denying her application for a DVRO. As we shall explain, we disagree with these contentions and conclude A.A. has not met her burden of affirmatively establishing reversible error.

We review a trial court's factual findings under the DVPA for substantial evidence, (*J.J. v. M.F.* (2014) 223 Cal.App.4th 968, 975) and we review a trial court's denial of a domestic violence restraining order for abuse of discretion (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226). With these standards in mind, we emphasize that we must defer to the trial court's credibility findings when supported by substantial evidence, and we do not reweigh credibility findings on appeal. (*Niko, supra,* 144 Cal.App.4th at pp. 364–365; *Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 823 [" 'We must accept as true all evidence . . . tending to establish the correctness of the trial court's findings . . . , resolving every conflict in favor of the judgment.' "].)

A.A. argues there was sufficient evidence of physical abuse and coercive control by Father to justify the issuance of a restraining order, focusing largely on isolated excerpts from the record. Indeed, during the evidentiary hearing, A.A. presented evidence of alleged acts of physical force by Father through her testimony and video recordings of prior statements. She alleged that Father grabbed her hands and wrists, squeezed her ribs in a painful

manner, and threw her down. In reviewing this evidence, we agree with the trial court's statement that these allegations, *if believed*, would constitute behavior that may be enjoined under section 6320. But after meticulously weighing the totality of the evidence, the trial court made extensive credibility findings that undermined A.A.'s claims, and we will not disturb these findings on appeal.

Father expressly denied using force with A.A. except in instances in which he needed to restrain A.A. for her own safety. Father testified that on multiple occasions, A.A. physically attacked Father and attempted to run away, and in these circumstances he used gentle physical force to prevent A.A. from hurting herself. Dr. Sparta's report, which was considered by the trial court in assessing the credibility of the parties, corroborated Father's testimony. Dr. Sparta noted instances in which Father refrained from becoming angry or retaliatory when A.A. acted aggressively and provocatively towards him. The court also viewed video evidence of Father physically restraining A.A. during a custody exchange, and expressly found that the force he used did not qualify as abuse under section 6320.

By contrast, the trial court found credible Dr. Sparta's findings that A.A.'s claims of physical force by Father were "inconsistent and contradictory." The report discussed multiple instances in which A.A. made allegations against Father that were demonstrably false (including her claim that Father took away all of her toys, when a visit to Father's home showed an abundance of toys), and numerous child protective services referrals regarding Father that were determined to be unfounded. The court also considered the testimony of the court-appointed professional visitation monitor, Kabban, who supervised over 40 visits between A.A. and Father and did not observe Father to act inappropriately.

Thus, the trial court impliedly found Father's testimony to be credible in concluding A.A. failed to meet her burden of establishing evidence of abuse under the DVPA. (See *Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 257 ["absent an express credibility finding, we must infer the trial court resolved questions of credibility in a manner that supports its findings and order"].) And we conclude the trial court's credibility finding is supported by substantial evidence. The record evidence before the trial court established that A.A. was exposed to extreme conflict between the parents, and her negative beliefs towards Father were "at least partly based on inaccurate, negative information [that] were communicated in an emotionally coercive context." And in its own observations of A.A., the trial court found her descriptions of Father to be "absolute and very extreme," and thus impliedly not credible.

Similarly, the trial court's finding that A.A. failed to establish her allegations of coercive control by Father is also supported by substantial evidence. Abuse, as defined in the DVPA, includes conduct that " 'disturb[s] the peace of the other party' " in a way that "destroys the mental or emotional calm of the other party." (§ 6320, subd. (c); see also *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 [" '[D]isturbing the peace of the other party' " refers to conduct that, based on the totality of the circumstances, "destroys the mental or emotional calm of the other party."].) Disturbing the peace of the other party includes, but is not limited to, "coercive control." (§ 6320, subd. (c).) Relevant here, coercive control may include behavior such as isolating the other party from relatives and monitoring the other party's movements, communications, and daily behavior. (§ 6320, subd. (c).)

In her briefing, A.A. suggests the trial court did not consider A.A.'s isolation from her maternal relatives as a form of coercive control in rendering its decision, and therefore she argues the court did not correctly apply the applicable law. However, the record demonstrates that the court considered and rejected A.A.'s argument that Father isolated her in a manner constituting coercive control under section 6320. In rejecting this argument, the court discussed the applicable law and expressly found that the evidence did not establish A.A.'s legal "theory of isolation and coercive control."

In so finding, the trial court acknowledged the complexity of the family's circumstances and the importance of the maternal relatives in A.A.'s life. However, the court found that the history of the parents' conflict and the maternal relatives' recent conduct "certainly would support why [Father] would not be warm to having [A.A.] have a lot of contact with [the maternal relatives.]" Father provided further context, testifying that he limited A.A.'s visitation with her maternal relatives due to health concerns on both sides of the family during the Covid-19 pandemic. Accordingly, drawing all reasonable inferences in favor of the trial court's findings, as we must, we conclude substantial evidence supported the court's finding that A.A. failed to establish coercive control under section 6320.

In sum, with substantial evidence supporting its factual findings, we conclude the trial court did not abuse its discretion in denying A.A.'s application for a DVRO. (See *Herriott v. Herriott* (2019) 33 Cal.App.5th 212, 223 [we will not reverse the trial court's decision unless the court " ' " 'exceeded the bounds of reason' or it can 'fairly be said' that no judge would reasonably make the same order under the same circumstances" ' "].)

## III.

### *Asserted Judicial Bias*

A.A. does not set forth a separate contention that the judgment must be reversed because of purported bias by the trial court, but intermingles tangential claims of alleged judicial bias throughout her brief. For example, she states in conclusory manner, "[w]ithout the errors, bias, and prejudice demonstrated by the [trial] [c]ourt, I truly believe [A.A.] would already by enjoying her childhood in peace." She alleges, without any corresponding citation to the record, "[d]ue to bias and favoritism, [Father] was going to win against [A.A.] in this DVRO trial no matter how numerous and voluminous the amount of the evidence, or how wonderful, articulate, and credible [A.A.] was in her sealed testimony."

We conclude A.A. has forfeited any claim of judicial bias by failing to file a motion to disqualify the trial judge pursuant to Code of Civil Procedure section 170.3, or otherwise timely raising or objecting to the purported bias in the proceedings below. (See *Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1218 [appellants failed to "preserve their claim of judicial bias for review because they did not object to the alleged improprieties and never asked the judge to correct remarks made or recuse himself"].) A.A. was required to object "at the earliest practicable opportunity" and set forth the grounds for the disqualification of the judge, and she failed to do so. (Code Civ. Proc., § 170.3, subd. (c)(1).) Accordingly, she has failed to preserve this claim for appeal. (*Moulton,* at p. 1218.)

Even if not forfeited, we find no merit to the claim. Although A.A. contends the trial court erred in several of its rulings, "[t]he mere fact that the trial court issued rulings adverse to [A.A.] on several matters in this case, even assuming one or more of those rulings were erroneous, does not indicate

22

an appearance of bias, much less demonstrate actual bias." (*Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 674; see also, *Blakemore v. Superior Court* (2005) 129 Cal.App.4th 36, 59–60 [mere erroneous rulings do not show appearance of bias].) Likewise, "[m]ere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) A.A., as the party bearing the burden of proving prejudicial judicial bias, has failed to affirmatively demonstrate evidence of bias by the trial court. (*Guerra,* at p. 1112.) To the contrary, the record demonstrates A.A. received a fair evidentiary hearing before an unbiased court.

IV.

*The Award of Attorney Fees Against the GAL Is Not Authorized Under Section 6344 Because GAL Is Not a "Party"*

Although GAL does not set forth a separate argument challenging the trial court's award of attorney fees, or legal authority to support her claim, she states, "we appeal the award of $5,000 in attorney fees against GAL to [Father]." We review the determination of the legal basis for an award of attorney fees de novo (*Leamon v. Krajkiewcz* (2003) 107 Cal.App.4th 424, 431), and "[w]e apply an abuse of discretion standard in reviewing the amount of an attorney fee award" (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1509). Under the de novo standard, we conclude the award of attorney fees against GAL, (maternal aunt N.D.) who was not a party to the action, was not legally authorized.

23

Pursuant to former section 6344,[11] a trial court may award attorney fees to the prevailing party in a DVRO proceeding. (Former § 6344, subd.(a) ["[a]fter notice and a hearing, the court may issue an order for the payment of attorney's fees and costs of the prevailing party"].) However, "[a] guardian ad litem is not a party to the action, but merely a party's representative." (*In re Christina B.* (1993) 19 Cal.App.4th 1441, 1453.) Because a guardian ad litem is not a party, " 'a judgment may not be rendered for or against a guardian ad litem, but only for or against the party he [or she] represents." (*First Security Bank of California, N.A. v. Paquet* (2002) 98 Cal.App.4th 468, 475, italics omitted.)

Here, following the presentation of evidence at the evidentiary hearing, Father asked the court to order GAL "to pay the entirety of his [attorney] fees, $30,710.50, as the prevailing party." The court considered GAL's and Father's respective incomes and ability to pay, and ordered GAL to pay $5,000 in attorney fees to Father under former section 6344. In its statement of decision and judgment, the trial ordered "attorney fees on behalf of the prevailing party, [Father,] in the amount of $5,000 against [GAL] directly to [Father's] counsel . . . payable at the rate of $150 per month until paid in full." This was error.

---

[11]    Section 6344 was amended, effective January 1, 2023, to *require* the court to issue an order for the payment of attorney fees to a prevailing petitioner, and *authorize* the court to issue an order for the payment of attorney fees to a prevailing respondent if the respondent establishes by a preponderance of the evidence that the petition was frivolous or solely intended to abuse, intimidate, or cause unnecessary delay. (See Assem. Bill No. 2369 (2021–22 Reg. Sess.); Stats. 2022, ch. 591.) The recent amendments to section 6344 do not affect our analysis as the petitioner was not the prevailing party and the award of attorney fees to respondent was not legally authorized as a matter of law.

The trial court was not permitted to enter a judgment of attorney fees against GAL because she was not a party to the restraining order proceeding. (See *Moore v. Kaufman* (2010) 189 Cal.App.4th 604, 616 [holding that a court may not award a judgment of attorney fees against a nonparty attorney].) The trial court's order purports to enter a judgment for attorney fees *against* GAL, who is acting as a representative of A.A.'s interests as her guardian ad litem and not a party to the action. The judgment for attorney fees against GAL was therefore unauthorized and we conclude the judgment is void. (*Selma Auto Mall II v. Appellate Department* 44 Cal.App.4th 1672, 1684 ["an award of costs not authorized by law is a ' "grant of relief to one of the parties which the law declares shall not be granted" ' and is therefore void."].) Accordingly, we vacate the order awarding attorney fees against GAL.

DISPOSITION

The order denying A.A.'s application for a DVRO is affirmed. The judgment awarding attorney fees against N.D. as GAL is vacated. In the interests of justice, no costs are awarded on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

DO, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.

25